UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DEMETTRESS BURNETT,

     Plaintiff,

     v.

FRANCISCAN ALLIANCE, INC.,

     Defendant.

CAUSE NO.: 2:21-CV-227-TLS

## OPINION AND ORDER

This matter is before the Court on Defendant Franciscan Alliance's Motion for Summary Judgment [ECF No. 23], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendant's motion.

## PROCEDURAL BACKGROUND

The Plaintiff Demettress Burnett filed a Complaint [ECF No. 1] against the Defendant Franciscan Alliance, Inc., bringing claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981); Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII); and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. (ADEA).

Under § 1981, the Plaintiff alleges the Defendant terminated her employment due to her race (Count I) and for engaging in protected activity (Count IV). Under Title VII, the Plaintiff alleges the Defendant terminated her employment due the following: (1) her race (Count II), (2) for engaging in protected activity (Count III), and (3) due to her religion (Count VI). Under the ADEA, the Plaintiff alleges the Defendant terminated her employment due to her age (Count V).

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## BACKGROUND FACTS[1]

### A.     The Plaintiff's Employment with the Defendant

The Plaintiff is an African American, Christian woman who is over the age of fifty-five. Pl. Ex. A, 4:17–18, 109:8–9, ECF No. 31-2; Def. Ex. I, ECF No. 23-51. She was hired by Nancy

---

[1] The facts offered by the parties are considered only to the extent they are supported by the properly cited evidence of record. In her response to the Defendant's Statement of Material Facts and in her Statement of Additional Facts, the Plaintiff makes several statements about what someone else thought, believed, or did without laying a foundation for her or the speaker's personal knowledge. *See Montgomery v. Am.*

Cutler, the Defendant's director of rehabilitation services, and began working for Defendant on

April 6, 2020, as an Inpatient Case Manager II in the Rehabilitation Department on April 6,

2020. Def. Ex. A at ¶ 3, ECF No. 23-1. There is just one case manager for the Defendant's

Rehabilitation Department, and that manager must engage with each patient and his or her family

to determine and plan for the patient's ongoing, unique needs. *Id*. at ¶ 5. The case manager is

also responsible for "assessing, facilitating, planning, and advocating health needs on an

individual basis. This position also performs admissions screening for all patients in a bed for

medical necessity, reviews for appropriateness of setting, utilization, care planning and facilitates

discharge planning on admission and concurrent basis." Def. Ex. A at ¶ 9; Def. Ex. A-1, ECF

No. 23-2.

The Defendant provided training and orientation to the Plaintiff during her first three

months of employment. Pl. Ex. A, 41:1–5. Pamela Daker, a registered nurse for the Defendant

and former case manager, first provided the Plaintiff with training. Def. Ex. B at ¶¶ 3, 6, Def. Ex.

B, ECF No. 23-5; Def. Ex. B-1, ECF No. 23-6. Daker had an orientation checklist that she used

to document the Plaintiff's training. Def. Ex. B at ¶ 7; Def. Ex. B-1. For each subject, Daker

initialed and provided the date on which she trained the Plaintiff. Def. Ex. B at ¶ 7; Def. Ex. B-1.

---

*Airlines*, *Inc*., 626 F.3d 382, 395–96 (7th Cir. 2010) ("[U]ncorroborated, self-serving testimony may suffice to prevent summary judgment in some circumstances, but [someone's] stated beliefs cannot create genuine issues of material fact when those beliefs lack a foundation of personal knowledge." (cleaned up)). She also makes several vague, conclusory statements not grounded in specific facts. *See King v. Ford Motor Co*., 872 F.3d 833, 840 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough to stave off summary judgment."). The Plaintiff additionally makes several statements citing to "Ex. A" (155 pages), "Ex. B" (7 pages), "Ex. C" (10 pages), "Ex. F" (5 pages), "Ex. J" (6 pages), "Ex. K" (3 pages), or "Ex. L" (3 pages) without providing the relevant page or paragraph number, which is in violation of Local Rule 56-1(e). *See* N.D. Ind. L.R. 56-1(e) ("The court may find a fact is not supported if the citation does not include a page or paragraph number to evidence in the record which can be presented in an admissible form unless the court may take judicial notice of the fact."). Thus, the Court disregards all these such statements.

Ellen Cano, a floor nurse in the Defendant's rehabilitation unit that was cross trained as a unit manager, also provided training to the Plaintiff. Def. Ex. C at ¶¶ 3, 5, ECF No, 23-8. When Cano trains someone, she types up the topics that are covered in orientation. *Id.* at ¶ 7; Def. Ex. C-2, ECF No. 23-10. She typed up the different topics that she covered with the Plaintiff. Def. Ex. C-2.

**B.      Orientation and Training Reviews Prior to the Performance Improvement Plan**

Daker completed three biweekly evaluations for the Plaintiff during her orientation and training. Def. Ex. B at ¶¶ 11-14; Def. Ex. B-2, ECF No. 23-7. On a scale of 1 to 5, a 1 is "Agree" and a 5 is "Disagree" with the statement, "Overall, the orientee is progressing well in the orientation." Def. Ex. B-2 at 1–4. The Plaintiff received the following scores for her overall progress for each evaluation: (1) April 16, 2020: 1; (2) April 29, 2020: 1; and (3) May 7, 2020: 2. *Id.* at 1–3. By date of evaluation, Daker noted the following areas in need of improvement: (1) April 16, 2020: familiarization with rehab policies and case management position; (2) April 29, 2020: prioritizing, increasing speed, time management; (3) May 7, 2020: staying on task, focus, improve prioritizing. *Id.*

Cano also completed biweekly evaluations for the Plaintiff during her orientation and training. Def. Ex. C at ¶ 6; Def. Ex. C-1, ECF No. 23-9. Cano emphasized Ms. Burnett's areas of strength to encourage her to improve and progress. Def. Ex. C at ¶ 9. She noted that the Plaintiff initially seemed to be progressing as expected. *Id.* at ¶ 8. As with the evaluations by Daker, on a scale of 1 to 5, a 1 is "Agree" and a 5 is "Disagree" with the statement, "Overall, the orientee is progressing well in the orientation." She received the following scores for her overall progress overall for each evaluation: (1) April 24, 2020: 3; (2) May 1, 2020: 2; (3) May 8, 2020: 3; (4)

May 22, 2020: 2; (5) June 4, 2020: 2; (6) June 15, 2020: 1; (7) June 23, 2020: 1; (8) July 3, 2020:

1. Def. Ex. C-1 at 1–8.

By date of evaluation, Cano also noted the following areas in need of improvement:

- April 24, 2020: perform as many new patient interviews as possible;

- May 1, 2020: prioritization, time management, and discharge planning;

- May 8, 2020: prioritization, discharge planning, and adding information to patient instructions;

- May 22, 2020: speed with accomplishing tasks/time management and awareness of resources available to patients;

- June 4, 2020: referrals, discharge planning, prioritization, and adding information to patient instructions;

- June 15, 2020: time management and prioritization by using the day after team conferences to get ahead on follow up calls and setting up services for patients, and focus on case management services like durable medical equipment;

- June 23, 2020: accuracy on admission logs and making sure that patient's families are aware of care recommendations as soon as possible.

- July 3, 2020: communicate and work with therapy staff frequently, inform of DC date, changes or updates with SNF pending status.

*Id.*

**C.**   **Performance Review Prior to the Performance Improvement Plan**

Additionally, on July 17, 2020, Ashley Garza, the Defendant's nurse manager of the

rehabilitation unit, reviewed the Plaintiff's performance from April 6, 2020, through July 6,

2020. Def. Ex. D at ¶ 3, ECF No. 23-20; Def. Ex. D-3, ECF No. 23-23. The review was on a

scale of 0 to 3; Ms. Garza gave the Plaintiff an overall score of 2.4 out of 3.0, and she gave the

Plaintiff a score of 1.7 out of 3.0 on job specific competencies. Def. Ex. D-3. Specifically, Garza

evaluated the Plaintiff in six job competency areas with the following corresponding scores:

patient documentation (2.0), post-discharge patient care liaison (0.0), compliance (2.0), medical

necessity and concurrent review (2.0), clinical care (chronic conditions) (2.0), and clinical care (quality of care) (2.0). *Id*. On the 3.0 scale, 2.0 is fully satisfactory, and 1.0 is needs improvement, but the review did not include an explanation for 3.0. *See id*.

In her review, Garza commented that her "biggest concern with [the Plaintiff] was her competency in the important area of post discharge patient care work. This includes areas like working with patients and their families to plan for the patients' discharge as well as ensuring patients are equipped with medical devices and other tools to leave [the Defendant's hospital] safely after are discharge." Def. Ex. D at ¶ 9. However, after Garza completed this review, she learned that the Plaintiff failed to follow up with Medicaid for patient T.B. *Id*. at ¶ 10.

**D.     Patient T.B. and the Medicaid/Healthy Indiana Plan Incident**

The Defendant admitted T.B. to the rehabilitation until on June 26, 2020, as a self-pay patient. *Id*. at ¶ 11; Def. Ex. D-4 at 1, ECF No. 23-24. The Defendant determined that T.B. was eligible for Medicaid through the Healthy Indiana Plan (HIP). Def. Ex. D at ¶ 11. The Plaintiff provided medical care for this patient with someone when she was in orientation until July 6, 2020. Pl. Ex. A, 77:19–20. In her July 1, 2020 conference care note, the Plaintiff listed T.B. as "Medicaid Pending." Def. Ex. D at ¶ 11; Def. Ex. D-4 at 1; Pl. Dep. 82:19-21. On July 2, 2020, Terese Lazano, a financial counselor for the Defendant, emailed the Plaintiff advising that Medicaid/HIP had been uploaded ("HAR has been updated"). Def. Ex. D at ¶ 12; Def. Ex. D-5, ECF No. 23-25.

About a week into T.B.'s stay, the Plaintiff asked Cano what to do about his insurance authorization, and Cano told her she needed to call HIP to determine what they needed for approval. Def. Ex. C at ¶ 17; Def. Ex. C-3, ECF No. 23-11. The Plaintiff did not ask Cano any follow up questions or flag any issues with the insurance. Def. Ex. C at ¶ 17. The Plaintiff

"know[s] that [she and Cano] tried to call several times to see if [T.B's] Medicaid had gotten approved . . . ." Pl. Ex. A, 75:25–76:4. She also "remember[s] calling [Medicaid], but . . . never got an answer." *Id*. 77:16–18. The Plaintiff's next step was "[t]o wait for Medicaid." *Id*. 82:24–83:2. The Plaintiff believes that when she was in orientation "that particular portion of [insurance authorization] should have been handled by whoever was orienting [her] at the time." *Id*. 76:15–17.

On July 7, 2020, Debra Richwalski, a financial counselor for the Defendant, contacted the Plaintiff and reminded her that patient T.B. had been approved for the HIP and that no authorization of his stay had been noted. Def. Ex. D at ¶ 15; Def. Ex. D-5. At this point, it was the Plaintiff's responsibility as the case manager to contact Medicaid/HIP to determine what information it needed to authorize T.B.'s rehabilitation stay. Def. Ex. D at ¶ 13. On July 8, 2020, the Plaintiff authored her patient care conference note for T.B. *Id*. at ¶ 17. Medicaid was no longer listed as "pending," and the plan was listed as "Anthem Healthy Indiana Plan." *Id*.

The Plaintiff did not work from July 9 through July 20, 2020, because she was quarantining due to a COVID exposure. Def. Ex. D at ¶ 18. The Plaintiff did not tell anyone that she had failed to contact Medicaid/HIP regarding approval for T.B.'s stay before leaving. *Id*. As a result, Garza was not aware that this important task was left undone, so that she could ensure someone else handled this for the Plaintiff in her absence. *Id*.

During the Plaintiff's absence, Daker filled in for the Plaintiff. Def. Ex. F-3 at 2, ECF No. 23-44. The Plaintiff believes that "[Daker] should have been making sure that [T.B.] was certified." Pl. Ex. A, 74:17–20. T.B. was discharged on July 24, 2020. Def. Ex. F-3 at 2. The Plaintiff did not contact Medicaid/HIP regarding authorization of T.B.'s rehabilitation stay, nor

did she fax any clinical information to Medicaid or determine when Medicaid required case updates on T.B. either before or after her COVID absence. Def. Ex. D at ¶ 16.

On August 15, 2020, Cano advised Garza that "[she] [does] not think that there was any communication with [T.B.'s] insurance at all" by the Plaintiff." Def. Ex. C-3. ECF No. 23-11. Cano recommended that Jennifer Bohlin, the Defendant's clinical denials specialist, look into the potential issue. *Id*.

On August 24, 2020, Bohlin confirmed that Medicaid denied coverage of T.B.'s medical stay, which resulted in a loss to the Defendant of $85,233.65. Def. Ex. D at ¶ 24; Def. Ex. F-3 at 2.

**E.     Other Incidents and Complaints Prior to the Performance Improvement Plan**

On June 26, 2020, a patient's family complained that the Plaintiff was rude and would not give information to the patient's daughters. Def. Ex. D at ¶ 7. Garza met with both the Plaintiff and Cano to discuss the patient complaint and educate the Plaintiff about HIPAA and appropriate phone procedures. *Id*. The Plaintiff agreed she would make more effort to help patients' families through difficult times. *Id*.

On August 15, 2020, Cano emailed Garza to express multiple concerns about the Plaintiff's ability to work independently and handle her case load. Def. Ex. C at ¶ 13; Def. Ex. C-3. For example, a patient in room 4522 was cleared to discharge home on 8/16 but was not set up for further therapy post-discharge. Def. Ex. C-3. There also was another discharge where the patient's IV antibiotics "were a problem" that delayed her discharge. *Id*. Cano stated that "[she] [was] starting to question whether the best options are sought out or presented to the patients and families and if the role of assisting the average joe with discharge planning is transpiring or if the easiest set up option is offered." *Id*. Cano's concern was that "[t]his means less therapy and many

8

less resources for the patients." *Id*. Additionally, Cano expressed that "[she] [was] very disappointed and frustrated when [she] is asked many questions during [her] nursing shifts, but the information is then not followed through on." *Id*. at 2.

On August 19, 2020, Bohlin advised Garza that she had multiple issues with the Plaintiff's delays in follow up and her failure to timely input patient information in her logs. Def. Ex. D at ¶ 25; Def. Ex. D-8, ECF No. 23-28. For example, Bohlin sent the Plaintiff an email on Friday, August 14, 2020, with "need discharged in UDS and . . . added to Excel Discharge log." Def. Ex. D-8 at 3. Bohlin emailed Garza on Wednesday, August 19, 2020, that there was still no follow up. *Id*. Additionally, on August 19, Cutler met with physiatrist, Dr. Abegaz. Def. Ex. A at ¶ 15. At her meeting, Cutler learned that Dr. Abegaz had to constantly remind the Plaintiff how to manage discharge planning, which was a key function of her job duties. *Id*.; Def. Ex. A-1 at 2, ECF No. 23-2. For example, the Plaintiff would fax Dr. Abegaz's orders to the wrong physicians or facilities. Def. Ex. A at ¶ 15.

On August 23, 2020, Cano spoke with the Plaintiff regarding the Plaintiff's continued questions about compliance and charting. Def. Ex. C at ¶ 19. Cano emailed Garza an explanation of the conversation because Garza witnessed part of it. *Id*.; Def. Ex. C-4, ECF No. 23-12. In the email, Cano explained that there was a patient who was medically transferred off the unit that later returned back to the unit. Def. Ex. C-4. Cano told the Plaintiff that

> she needed to look at the face sheet with the exact DC and re-admit time to see if it was a true 72 hours or less. It was. So, the patient must be conferenced immediately to avoid non-compliance and the plan of care continues on with the originally set DC date and goals.

*Id*. The Plaintiff expected Cano "to review the face sheets and previous chart notes to determine the above information. She was 'put out' when Cano told her, I answered your questions and now you need to do the leg work." *Id*.

9

**F.       Corrective Action and Performance Improvement Plan**

On August 25, 2020, Garza issued the Plaintiff a Corrective Action. Def. Ex. D at ¶ 27;

Def. Ex. D-9, ECF No 23-29. The Corrective Action lists the following as "what happened":

> A patient was admitted under self-pay and was changed to HIP after being admitted
> approximately a week. The financial department contacted [the Plaintiff] with this
> information multiple times. [The Plaintiff] asked Ellen Cano RN, what to do and
> she told her to call HIP and find out what information they needed for authorization.
> [] Due to the lack of follow through this is currently a denial in the amount of
> $85233.65.
>
> Writer [Garza] listened to a voice mail left for [the Plaintiff]. Family member called
> (screaming at the phone) multiple times and left messages which he stated "call me
> back for once." Family member was upset that [the Plaintiff] had bypassed him to
> speak with other family members. This was the husband who was listed on the face
> sheet.

Def. Ex. D-9 at 1.

To address these deficiencies, Garza initiated a Performance Improvement Plan (PIP) and

provided the Plaintiff with a second orientation period with Cano. Def. Ex. D at ¶¶ 27–30; Def.

Ex. D-11, ECF No. 23-31; Def. Ex. A at ¶ 24.[2] Garza did this since the Plaintiff had only served

as a case manager since April 2020, and she "hoped that putting her on clear notice of

deficiencies would motivate her to improve so that she could become a successful case manager

and long-term member of the rehabilitation department team." Def. Ex. D at ¶¶ 28–29.

Cutler was also personally involved with the decision to place the Plaintiff on the PIP.

Def. Ex. A at ¶ 16. Cutler's decision was based not only on the "several mistakes" made by the

Plaintiff and "complaints leading up to the PIP," but also on the fact that "shortly before the PIP

was pursued, [the Plaintiff] caused a high-dollar Medicaid denial of approximately $85,000

---

[2] Cutler explained that she "was present for the meeting on August 25, 2020, when Garza reviewed the
performance improvement plan in detail with [the Plaintiff]." Def. Ex. A at ¶ 20. "[The Plaintiff] left the
meeting early for an appointment and did not sign the performance improvement plan until the next
week." *Id.*

because she failed to follow up with the Healthy Indiana Plan/Medicaid regarding their authorization requirements for patient T.B.'s stay." *Id*. at ¶ 17.  Cutler explained that "[h]igh-dollar denials are not a common occurrence in the Rehab department." *Id*. ¶ 18. In addition to the high dollar denial, the Plaintiff "was rude to family members and did not acknowledge the concerns of patients' families." *Id*. at ¶ 19. Cutler averred that the Plaintiff's race, age, and religion were not factors in the decision to place her on a PIP. *Id*. at ¶¶ 21–23.

Yolanda Johnson, a nurse manager for the Defendant, assisted Garza and Cutler in preparing the Plaintiff's PIP because she had experience implementing such plans. Def. Ex. G at ¶ 6, ECF No. 23-52. They wanted Johnson to ensure the PIP process moved forward properly. *Id*. Johnson explained that the Defendant utilizes a PIP when an employee in their post-probationary period is not meeting expectations. *Id*. at ¶ 8. Johnson explained that a PIP is implemented when an employee has deficiencies that require correction, but his or her supervisor hopes that the employee can improve and does not want to move immediately to termination. *Id*. The Defendant uses an action plan template with PIPs, which is then completed with the specific deficiencies of that employee, as well as the requirements and expectations for their improvement. *Id*. at ¶ 9; Def. Ex. G-1, ECF No. 23-53.

On August 28, 2020, the Plaintiff participated in a meeting with Tareva McNeal, a human resources generalist for the Defendant, Johnson, and Garza to discuss the Corrective Action and the PIP. Def. Ex. F at ¶¶ 3, 5, ECF No. 23-41. Def. Ex. G at ¶ 10. The plan outlined the following four deficiencies "not being performed at the expected levels of competency": lack of coordination and transition of care; lack of communication; lack of follow through; and quality assurance-rehab audits. Def. Ex. G-2, ECF No. 23-54. The performance improvement plan also outlined specific improvement goals and expectations, including consistently: facilitating team

conference, communicating with all team members, following up with patient/family questions, and completing quality audits timely. *Id*. During the meeting, Johnson's "impression was that [] Garza was fair with presenting the performance improvement plan, but that [the Plaintiff] refused to take any responsibility for mistakes that she made." Def. Ex. G at ¶ 10. Also at the meeting, the Plaintiff expressed concern about why the PIP was given due to her belief that she had not received any complaints regarding her performance. Pl. Ex. A, 94:6–18.

## G.    The Plaintiff's Complaint to Human Resources

On September 5, 2020, the Plaintiff filed a complaint with the Defendant's human resources department, alleging that she was falsely accused of causing a payment denial on a Medicaid patient and then placed on a PIP in retaliation for complaining about noise in the rehabilitation unit to her supervisor and for complaining to her supervisor about a negative interaction she had back in June of 2020 with a coworker, floor nurse Holly Laird. Def. Ex. F at ¶ 6. The Defendant assigned McNeal to investigate the Plaintiff's retaliation claim. *Id*.

On September 8, 2020, McNeal, along with Aniya Carter, a benefits specialist for the Defendant, interviewed the Plaintiff via telephone regarding her allegations. *Id*. at ¶ 7. During the interview, the Plaintiff also told McNeal about issues she had getting along with two coworkers who were registered nurses, Janet Breece and Holly Laird. Def. Ex. F-2 at 2, ECF No. 23-43. The Plaintiff complained that Garza retaliated against her because she was friends with Breece and Laird. *Id*. The Plaintiff also complained that Cano was following behind her and always at her side during the new orientation. *Id*. at 3. The Plaintiff expressed that she wanted the PIP removed and did not want her orientation preceptor "hawking over everything that she's doing." *Id*.

On September 9, 2020, McNeal interviewed Garza regarding the Plaintiff's retaliation complaint. Def. Ex. F at ¶ 8. Garza explained that the Plaintiff did not call Medicaid/HIP regarding patient T.B., even though it was her responsibility as the case manager to do so. Def. Ex. F-3 at 2, ECF No. 23-44. Garza conveyed that when she had approached the Plaintiff on July 7 and inquired about any questions or concerns she had regarding Patient T.B., the Plaintiff replied that "she knew the process from orientation regarding patient's insurance review/processing." *Id*. In the interview, Garza conveyed the Plaintiff's interpersonal issues with Laird and Breece, as well as the noise complaint that the Plaintiff made. *Id*. Garza responded to these issues and felt that they were resolved. *Id*. at 3. Garza also provided a written statement to McNeal in which she explained that the Plaintiff had spoken with her during the week of August 17, 2020, and expressed concerns about how she felt like the job was "too much." Def. Ex. F-4 at 5, ECF No. 23-45. Garza spoke with the Plaintiff about time management issues and ways to make her day more manageable, but she also told the Plaintiff that the case manager position duties have not changed. *Id*.

On September 12, 2020, the Plaintiff wrote a letter to McNeal in follow up to their phone meeting. Def. Ex. F at ¶ 10; Def. Ex. F-5, ECF No. 23-46. The Plaintiff raised a concern about Garza's allegations that she failed to make calls to a patient's husband. Def. Ex. F-5 at 2. On September 14, 2020, McNeal followed up with Garza, requesting additional information that Garza provided in an email. Def. Ex. F at ¶ 11; Def. Ex. F-6, ECF No. 23-47. Garza clarified that the Plaintiff bypassed the husband (who had power of attorney for the patient) and called the son instead for patient updates. Def. Ex. F-6. The son did not have power of attorney, and the patient had asked for the Plaintiff to speak with her husband. *Id*. Garza also highlighted the voicemails from the patient's husband that the Plaintiff did not return. Def. Ex. F-6 at 2.

On September 22, 2020, McNeal provided the Plaintiff with the conclusions of her investigation of the claim of retaliation. Def. Ex. F-7, ECF No. 23-48. McNeal reviewed all the materials provided and considered her interview interactions with both the Plaintiff and Garza. Def. Ex. F at ¶ 12. McNeal determined that the Plaintiff had interpersonal issues with some coworkers on her unit. *Id*. The Plaintiff had also raised one noise complaint to her immediate supervisor, Garza, and Garza had addressed that complaint by allowing the Plaintiff to close her office door but leave her window blinds open to ensure that patients could still find her when they needed her help as a case manager. *Id*. The Plaintiff had not returned to Garza with further concerns related to noise, so McNeal concluded that the problem that the Plaintiff had complained of had been promptly and sufficiently remedied by Garza. *Id*. at ¶ 13. McNeal also determined that that Plaintiff had performance issues that warranted a PIP. *Id*. at ¶ 14. McNeal concluded that there was no evidence to indicate that the PIP was a form of harassment or retaliation because the Plaintiff had complained in the past to Garza. *Id*.

## H.    Performance Issues While On the PIP

On September 1, 2020, Cano began re-orienting the Plaintiff and reviewed all her progress and insurance notes. Def. Ex. C at ¶¶ 22–24; Def. Ex. C-5 at 2, ECF No. 23-13. Cano pointed out inaccuracies in the Plaintiff's team conference notes and admission log compliance. Def. Ex. C-5 at 2. Cano stressed the importance of accurately completing logs. *Id*. Cano also educated the Plaintiff regarding calling the legal department, securing skilled nursing facility discharge dates, and the general role of the case manager. *Id*. Also on September 1, Cano completed an orientee evaluation. Def. Ex. C at ¶ 24; Def. Ex. C-6 at 1, ECF No. 23-14. She neither agreed nor disagreed that the Plaintiff was progressing well, though she rated her documentation skills as "good." Def. Ex. C at ¶ 24; Def. Ex. C-6 at 1. Cano identified that the

14

Plaintiff needed more details in her progress notes and needed to improve on skilled nursing facility transitions and communication with family. Def. Ex. C-6 at 1.

On September 3, Bohlin emailed the Plaintiff and asked her to enter a patient into the discharge logs. Def. Ex. D at ¶ 33; Def. Ex. D-12, ECF No. 23-32. This patient had been discharged on August 31, 2020. Def. Ex. D at ¶ 33; Def. Ex. D-12. The Plaintiff did not reply to Bohlin, nor did she enter the patient into the discharge logs. Def. Ex. D at ¶ 33. Also on September 3, Garza and Johnson met with the Plaintiff, and Garza delineated her expectations and the areas where the Plaintiff needed improvement. Def. Ex. D at ¶ 32; Def. Ex. G-3, ECF No. 23-55; Def. Ex. G. at ¶ 12. At this meeting, the Plaintiff agreed that she needed additional training regarding audits, wellness calls, and patient logs. However, she also insisted that she could not understand why she needed a PIP. Def. Ex. D at ¶ 32. The Plaintiff deflected responsibility for her own professional development and stated that other employees needed to learn their roles too. Def. Ex. G at ¶ 12; Def. Ex. G-3. Garza again explained the Plaintiff's performance deficiencies and her need for improvement. Def. Ex. D at ¶ 32.

On September 8, 2020, Bohlin advised Garza that the Plaintiff had not entered any admissions into the logs since September 3, 2020. Def. Ex. D at ¶ 35; Def. Ex. D-13 at 1, ECF No. 23-33. Kristin Morrow, a physical therapist, also emailed the Plaintiff to request that she communicate with the physical therapists regarding patients who would be discharged ahead of schedule. Def. Ex. D at ¶ 35; Def. Ex. D-13 at 5.

On September 10, 2020, the Plaintiff was absent, and Cano covered for her that day. Def. Ex. C at ¶ 25. Cano had to spend a significant amount of her day fixing the Plaintiff's mistakes. *Id*. For example, Cano added missing discharge dates to the white boards and fixed the discharge and admission logs that the Plaintiff had previously done. *Id*. Cano also created a master to-do

list to use as a handoff for the Plaintiff to complete when she returned. *Id*.; Def. Ex. C-7, ECF No. 23-15. Also on September 10, Diane Fiello, an employee of the Defendant, emailed the Plaintiff with her third request for the Plaintiff to complete a task. Def. Ex. D at ¶ 36; Def. Ex. D-14, ECF No. 23-34. More specifically, on September 1, 2020, Fiello had asked the Plaintiff to add one patient from the Dyer Campus to the discharge log. Def. Ex. D at ¶ 36; Def. Ex. D-14. She had asked the Hammond Case Manager to add a missing patient from that campus as well. Def. Ex. D at ¶ 36; Def. Ex. D-14. The Hammond Case Manager replied within twenty minutes of the request to advise that she completed the task. Def. Ex. D at ¶ 36. The Plaintiff never replied, even after she returned from her absence. Def. Ex. D at ¶ 36; Def. Ex. D-14.

On September 11, 2020, Garza, Johnson, and Cano met with the Plaintiff. Def. Ex. D at ¶ 37; Def. Ex. G at ¶ 13. At this point, it was clear to Garza and Johnson that the Plaintiff struggled with time management, compliance, documentation, and communication. Def. Ex. D at ¶ 37; Def. Ex. G at ¶ 13. Garza instructed the Plaintiff to check in with Cano three times daily to review her plans. Def. Ex. D at ¶ 37. Garza's hope was that Cano could teach the Plaintiff how to appropriately prioritize her tasks and manage her case load. *Id*.

Additionally on September 11, Cano emailed Garza regarding her concerns with the Plaintiff's communication style. Def. Ex. C at ¶ 27; Def. Ex. C-9, ECF No. 23-17. Cano conveyed her observation that when she provided constructive feedback, the Plaintiff was curt, defensive, and argumentative. Def. Ex. C at ¶ 27; Def. Ex. C-9. The Plaintiff continued to make excuses for her performance and seemed unwilling to collaborate with Cano and Garza regarding a successful completion of her orientation. Def. Ex. C. at ¶ 27; Def. Ex. C-9.

On September 14, 2020, Cano attempted to help the Plaintiff put the organizational tips into practice. Def. Ex. C at ¶ 26; Def. Ex. C-5; Def. Ex. C-8, ECF No. 23-16. Cano believed that

the Plaintiff was not receptive to her assistance and that the Plaintiff was not efficient or accurate when completing tasks. Def. Ex. C at ¶ 26.

On September 15, 2020, Garza followed up on a family's complaints regarding the Plaintiff. Def. Ex. D at ¶ 38; Def. Ex. D-15, ECF No. 23-35. The family complained because the Plaintiff did not inform them what they could expect when the patient would be discharged. Def. Ex. D at ¶ 38.

On September 18, 2020, Garza and Cano had another check-in meeting with the Plaintiff. Def. Ex. D at ¶ 39; Def. Ex. D-16, ECF No. 23-36. The Plaintiff blamed Cano and Garza for her errors and failure to complete tasks. Def. Ex. D at ¶ 43. She complained that they were setting her up to fail. *Id*. Yet when Garza asked if she had any other areas where she wanted additional learning, she said "not at this time." *Id*. After that September 18 meeting, it was clear to Garza that the Plaintiff had made no improvements and was not making any efforts towards the needed improvements. Def. Ex. D at ¶ 44.

Beginning on September 23, 2020, the Plaintiff was required to provide Cano with her to-do list for the day. Cano Aff, at ¶ 28; Def, Ex. C-10, ECF No. 23-18. Cano had to review her list and add important tasks that she forgot. Cano Aff, at ¶ 28. Cano provided the Plaintiff with guidance on prioritization. *Id*. However, the Plaintiff often did not handle the additional tasks that Cano flagged for her. *Id*.

On September 24, 2020, the Plaintiff met Cano and Garza. Cano Aff, at ¶ 29. Because one of the families had complained about the Plaintiff, Cano was handling communications with the family. *Id*. The Plaintiff had to be reminded for a third time that she was still responsible for the patient's behind-the-scenes paperwork, hemodialysis, and transfer to a skilled nursing facility. *Id*.; Def. Ex. C-10 at 5.

17

On September 25, 2020, Cano met with the Plaintiff, and one of the rehab doctors, Dr. Ameeruddin, was also present. Cano Aff, at ¶ 30. The Plaintiff inaccurately documented the morning call and continued to omit important details from her progress notes. *Id*.; Def. Ex. C-10 at 7.

On September 28, 2020, the Plaintiff began working independently again (without Cano as her preceptor). Cano Aff, at ¶ 31. On September 29, 2020, Cano performed a chart review to assess how the Plaintiff was handling working independently. *Id*. Cano found that she made crucial errors related to six patients in the two days that she was working independently. *Id*.; Def. Ex. C-11, ECF No. 23-19. On September 30, 2020, Morrow emailed Garza to advise that the Plaintiff tried to give one of the Defendant's wheelchairs to a patient to take home since she had failed to timely order a wheelchair in connection with discharge planning. Def. Ex. D at ¶ 45; Def. Ex. D-17, ECF No 23-37.

On October 12, 2020, Garza received the following complaint from a patient's son regarding the Plaintiff: "The case manager's bedside manner is very cold. I find it really off-putting. It's like she's bothered by it all, like she doesn't have time. She doesn't come to me; I have to ask for her. But I don't know my mom is leaving, I don't know the paperwork." Def. Ex. D-18 at 11, ECF No. 23-38.

## I.     Termination of the Plaintiff's Employment

On October 1, 2020, Cutler and Garza proposed the Plaintiff's termination to the Defendant's human resources department. Def. Ex. A at ¶ 34; Def. Ex. D at ¶ 47. They proposed termination because the Plaintiff's work did not improve, even with the extra support provided and despite the warning and notice she received of deficiencies. Def. Ex. A. at ¶¶ 27–33; Def. Ex. D at ¶¶ 47–48. Garza was also concerned for the safety of the Defendant's rehab patients,

particularly when it came to discharges and ensuring patients received the appropriate care when released. Def. Ex. D at ¶ 47. Cutler felt that termination was warranted due to the Plaintiff's failure to comply with the department's Discharge Planning Policy. Def. Ex. A at ¶¶ 29–30; Def. Ex. A-3, ECF No. 23-4. She also felt termination was warranted because the Plaintiff failed to consistently follow up with other resources for ongoing services upon discharge, failed to complete required tasks within the required time frame, and continued to exhibit deficiencies in communication with other care team members and with patient families. Def. Ex. A at ¶¶ 30–32.

McNeal assessed Garza and Cutler's termination recommendation. Def. Ex. F at ¶¶ 16–17. She reviewed the Plaintiff's failure to correct the deficiencies identified in her PIP. *Id.* at ¶ 17. McNeal concluded that the Plaintiff's performance failures jeopardized patient safety in multiple ways. *Id.* at ¶ 18. One significant failure involved failing to prepare for patients to be discharged and ensuring proper planning for the patients and families to go home with resources to meet the patients' continuing medical challenges. *Id.* Another issue was the Plaintiff's time management and communication problems. *Id.* Based on McNeal's understanding and analysis and her personal involvement, it was her understanding that the Plaintiff received additional training and opportunities to improve. *Id.* at ¶ 19. However, the Plaintiff did not exhibit a willingness to accept constructive criticism. *Id.* She failed to make improvements in the areas of discharge preparation, discharge supplies, time management, customer service, team communication, family communication, inaccurate documentation, and she did not follow through on orders and remedying deficiencies. *Id.*

Consequently, on October 13, 2020, the Defendant terminated the Plaintiff for unsatisfactory work performance, unsatisfactory work behavior, and policy or rule violations after she failed to improve on the PIP. *Id.* at ¶ 19; Def. Ex. F-9 at 1, ECF No. 23-50. The

termination form lists policy violations, including violation of the Defendant's Corrective Action Policy 1003.06 for conduct that jeopardizes patient care and violation of the Defendant's Discharge Planning Policy 1200. Def. Ex. F-9 at 2. The termination form lists the following performance issues as reasons for the termination: discharge preparation, discharge supplies, time management, customer service, team communication, family communication, logs/UDS, and lack of follow through. *Id.* at 1. Additionally, "[m]ultiple patients are involved by the lack of communication with patient families, lack of discharge preparation so they can safely function in their home, lack of resources arranged in a timely manner causing angry family members and last minute juggling of resources including most recently having to provide hospital wheelchairs to patients being discharged." *Id.*

## ANALYSIS

The Defendant moves for summary judgment on each of the Plaintiff's claims. The Court first addresses the § 1981, Title VII, and the ADEA discrimination claims before turning to the remaining § 1981 and Title VII retaliation claims.

### A.      42 U.S.C. § 1981, Title VII, and ADEA Discrimination Claims

Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Under Title VII, it is unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the ADEA, it is unlawful for an employer to take adverse action against an employee who is forty years or older "because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a).

20

To succeed on her Title VII discrimination claims, the Plaintiff must prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Courts analyze discrimination claims under Title VII and § 1981 "largely identical[ly]." *Id*. The main difference is that "discrimination claims under Title VII simply require that [the protected characteristic] be a motivating factor in the defendant's challenged employment decision." *Id*. (cleaned up). However, discrimination claims under § 1981 require the plaintiff to show the protected characteristic "was a but-for cause of [her] injury." *Id*. (cleaned up). Similarly, age discrimination claims require a "private-sector employee," such as the Plaintiff here, "to prove that age was the but-for cause of the adverse employment action." *Id*. Because the Court analyzes claims of discrimination under § 1981, Title VII, and the ADEA in a similar manner and the Plaintiff makes argument on her discrimination claims together, the Court considers below the Plaintiff's claims under § 1981, Title VII, and the ADEA together. *See Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019) ("[Courts] apply the same standard to discrimination claims under § 1981, Title VII, and the [ADEA].").

The Plaintiff relies on the *McDonell Douglas* burden-shifting framework for these claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the Plaintiff must establish a prima facie case of employment discrimination by showing the following:

> (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.

*Lewis*, 36 F.4th at 759 (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020). If the Plaintiff meets each element of her prima facie case, the burden then shifts to the Defendant

"to offer a nondiscriminatory justification for the challenged employment action." *Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022). The burden then shifts back to the Plaintiff to show the Defendant's "proffered nondiscriminatory reason amounted to pretext for discrimination." *Id.*

In this case, the Defendant contends that summary judgment should be granted on the Plaintiff's discrimination claims because she has, among other things, (1) failed to establish a prima facia case of discrimination due to her race, religion, or age under the *McDonnell Douglas* burden-shifting framework, (2) failed to demonstrate the Defendant's nondiscriminatory reasons for her termination were pretextual, and (3) otherwise failed to show that a reasonable jury could find the evidence as a whole supports her claim of discrimination based on race, religion, or age. The Court agrees that the Plaintiff has failed to demonstrate that the Defendant's nondiscriminatory reasons for her termination were pretextual or to otherwise point to evidence that as a whole shows unlawful discrimination. Thus, the Court need not consider the Defendant's remaining arguments on establishing a prima facie case.

1.      *Legitimate Nondiscriminatory Reasons for Termination*

Here, the Defendant is entitled to summary judgment because it has presented unrebutted, nondiscriminatory reasons for the Plaintiff's termination. Specifically, the Defendant cites the Plaintiff's termination form that refers to the Plaintiff's performance issues with the following, facially nondiscriminatory reasons for its termination decision: (1) discharge preparation; (2) discharge supplies; (3) time management; (4) customer service; (5) team communication; (6) family communication; (7) logs; and (8) follow-through. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 354 (7th Cir. 2023) (finding the

22

plaintiff forfeited his arguments on pretext that were not raised before the district court); *Barnes-Staples v. Carnahan*, 88 F.4th 712, 719 (7th Cir. 2023) (finding that the plaintiff waived her sex discrimination claim under Title VII when she did not "develop" her argument before the district court by providing evidence or by illustrating specific unlawful conduct); *Tyburski*, 964 F.3d at 600 (determining that the plaintiff waived argument on evidence in the record supporting an inference of an improper motive when he did not raise the issue before the district court); *Coleman v. Hardy*, 690 F.3d 811, 819 (7th Cir. 2012) ("[I]f the argument itself was not adequately developed [before the district court], it is . . . waived."). Accordingly, the Court concludes that the Defendant has met its burden of producing nondiscriminatory justifications for the Plaintiff's termination.

2.      *Pretext*

a.      Whether the Defendant Treated the Plaintiff Differently Than Similarly Situated Employee(s)

As to pretext, the Plaintiff first attempts to meet her burden by arguing that the Defendant applied its disciplinary policy in a discriminatory manner. A plaintiff who admits she violated a policy may show pretext by establishing that "she was disciplined more harshly than . . . employees [outside of her protected class] who also violated the policy." *Curry v. Menard, Inc*., 270 F.3d 473, 478 (7th Cir. 2001). Such a plaintiff must show that "she was treated differently than similarly situated employees not in her protected class." *Id*. "To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was directly comparable to her in all material respects so as to eliminate other possible explanatory variables." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 805 (7th Cir. 2022) (cleaned up).

"Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 226 (7th Cir. 2017) (cleaned up). "Though similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022). "In cases . . . where the plaintiff alleges the employer disciplined [her] more harshly than [her] comparator, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Id*. Here, the Court concludes that the Plaintiff has not identified a similarly situated employee.

The Plaintiff appears to identify Cano and Daker as employees who she believes were treated differently than she was.[3] In support, the Plaintiff provides five main assertions: (1) it was Cano and Daker who committed the Medicaid denial error connected to patient T.B.'s rehabilitation stay; (2) but it was the Plaintiff who was penalized for it; (3) in the past, Cano, Daker, and other individuals who held the case manager position were never penalized for Medicaid denials that resulted in a loss; (4) Medicaid denials that resulted in a loss occurred often; and (5) yet the only one ever penalized and terminated for such a loss was the Plaintiff. The Court finds these assertions are inadequate.

As to her first assertion, it is undisputed that the Plaintiff did not follow through with Medicaid regarding the authorization for patient T.B's stay, nor did she ask Cano any clarifying questions or flag any issues with the authorization during T.B.'s stay when she was working.

---

[3] To the extent that the Plaintiff begins to identify "Huss" as a similarly situated employee, she does not develop her argument; thus, it is waived. *See, e.g.*, *Barnes-Staples*, 88 F.4th at 719.

Also, it is undisputed that, at the time of T.B.'s stay, the rehabilitation unit had only one case manager—the Plaintiff. Cano was a floor nurse, and Daker was a registered nurse. However, the Plaintiff does not attempt to show that they all held similar job descriptions in light of their different titles and thus has waived any such argument. *See, e.g., Xiong*, 62 F.4th at 354. Additionally, even if her other four assertions were not conclusory,[4] the Plaintiff does not address the eight categories of performance deficiencies that the Defendant gave as reasons for her termination and the Defendant's extensive documentation of specific instances involving these performance deficiencies (as recited in the Background Facts above), including the Plaintiff's failure to comply with the Defendant's Discharge Planning Policy, nor does she attempt to show that Cano and Daker had comparable performance deficiencies or a comparable failure to comply with the Discharge Planning Policy, waiving any such argument. *See Reives*, 29 F.4th at 892 ("[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness."); *King*, 872 F.3d at 842 ("King identifies four other employees who she believes were treated better than she was. However, she does not say how, nor does she attempt to show that they are similarly situated to her or even that they are outside her protected class."). Accordingly, any different treatment of Cano and Daker by the Defendant offers no support for a finding that the Defendant's termination of the Plaintiff was a pretext for unlawful discrimination. *See Downing*, 48 F.4th at 805; *King*, 872 F.3d at 842.

---

[4] Because it is not dispositive, the Court need not decide this issue. For the same reason, the Court need not address the Defendant's argument that the Plaintiff's "similarly situated" witnesses statements are hearsay.

b.      Whether the Defendant's Decisionmakers Honestly Believed the Termination Reasons

In assessing pretext, courts do not "evaluate whether the employer's proffered justification was accurate or even whether it was unfair. [The] sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). Pretext means "more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Id*. (cleaned up); *see Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("[P]retext does not exist if the decisionmaker honestly believed the nondiscriminatory reason."). In other words, it does not matter here if the parties dispute: (1) that the Plaintiff had the performance issues that the Defendant designated, or (2) the accuracy of the complaints the Defendant received about her. "[T]he only question is whether the [Defendant] *honestly believed* it had [] non-discriminatory reason[s] for [her] termination." *Brooks*, 39 F.4th at 436 (emphasis added).

Additionally, when an employer defendant raises more than one reason for an employee plaintiff's termination, the plaintiff "[has] to raise an issue as to pretext for each proffered [reason] to withstand summary judgment." *Simpson v. Beaver Dam Cmty. Hosps., Inc*., 780 F.3d 784, 798 (7th Cir. 2015). Otherwise, the plaintiff must show that the defendant's reasons "are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Fischer v. Avanade, Inc*., 519 F.3d 393, 404 (7th Cir. 2008) (cleaned up). Furthermore, the Seventh Circuit has emphasized that "courts must assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' regardless of whether the Court also analyzes the evidence pursuant to *McDonnell Douglas*." *Tyburski*, 964 F.3d at 598 (quoting *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016)).

26

Here, the Plaintiff also argues that her termination was based on patient T.B.'s Medicaid denial that resulted in loss, which, according to her, was a lie because it was not the real reason for the termination. However, when viewed as a whole, the Plaintiff's characterization of the record on the Defendant's justification for her termination is inaccurate, as the termination form lists eight categorical reasons for her termination that the Defendant supports with extensive documentation (as recited in the Background Facts above). She does not say how or even attempt to show the following: (1) each of these eight reasons were a pretext for unlawful discrimination; (2) the Medicaid denial is intertwined with each of those reasons; or (3) the Medicaid denial's pretextual character is so fishy or suspicious that she could withstand summary judgment. *See Simpson*, 780 F.3d at 798; *Fischer*, 519 F.3d at 404. Accordingly, based on the arguments and evidence before the Court, the Medicaid denial as raised by the Plaintiff is not a sufficient basis for finding that the Defendant's justification for terminating the Plaintiff was a pretext for unlawful discrimination.

To the extent that the Plaintiff's Statement of Material Facts and testimony dispute that she had the performance issues raised by the Defendant's decisionmakers Cutler, Garza, and McNeal and the accuracy of complaints received about her, whether the decisionmakers were incorrect regarding the Plaintiff's performance issues or the complaints received were accurate is not the test. Rather, the question is whether they honestly believed that the Plaintiff had unresolved problems within the areas of discharge preparation, discharge supplies, time management, customer service, team communication, family communication, logs, and follow-through. Even if the Plaintiff had offered evidence to dispute these reasons, she does not say how or even attempt to show that Garza, Cutler, and McNeal did not honestly believe the stated reasons for her termination and thus waives any such argument. Thus, the Plaintiff has not shown

pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in the Defendant's stated reasons "that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Furthermore, the evidence when viewed as a whole does not show race, religion, or age discrimination was the reason, even in part, for the Plaintiff's termination. The record largely shows that the Plaintiff's poor job performance and the multiple complaints from her rehabilitation unit team members and patient family members were the reasons for her termination. Other than her subjective beliefs, the Plaintiff provides no evidence that race, religion, or age discrimination influenced the Defendant's decision to terminate her. *See Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) (finding that the plaintiff's "subjective beliefs" about the implications of the defendant's statements were insufficient to create a genuine issue of material fact).

Accordingly, the Plaintiff has failed to establish pretext, and the Defendant is entitled to summary judgment on her § 1981, Title VII, and ADEA discrimination claims. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments with respect to whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901 ("[The court] need not address any of the plaintiffs' arguments with respect to whether they have established a prima facie case because, even if [the court] assume[s] that the plaintiffs have met this burden, [the court] still must hold that they have failed to produce sufficient evidence of pretext."). Therefore, the Court grants summary

judgment in favor of the Defendant on the Plaintiff's § 1981, Title VII, and ADEA

discrimination claims in Counts I, II, V, and VI.

**B.      42 U.S.C. § 1981 and Title VII Retaliation Claims**

Under Title VII, an employer is prohibited "from retaliating against an employee for

opposing or participating in an investigation of an unlawful employment practice." *Lewis v.*

*Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citing 42 U.S.C. § 2000e-3(a)). To survive summary

judgment on this claim, the Plaintiff must offer "enough evidence to permit a reasonable jury to

find that: (1) [she] engaged in protected activity; (2) [she] suffered an adverse employment

action; and (3) a causal connection exists between the protected activity and that adverse

employment action." *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023). The Court

will then "evaluate the evidence as a whole to determine if it 'would permit a reasonable

factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor

caused the discharge or other adverse employment action." *Lewis*, 909 F.3d at 867 (quoting

*Ortiz*, 834 F.3d at 764–65).

For the first time in her summary judgment response brief, the Plaintiff argues that the

Defendant retaliated against her for a discrimination complaint she made in a letter to McNeal,

an HR generalist employed by the Defendant. The Defendant argues that it is entitled to

summary judgment because the Plaintiff has not shown a protected activity. The Court agrees

with the Defendant and concludes that summary judgment is appropriate on the Plaintiff's

§ 1981 and Title VII retaliation claims.

To be considered a statutorily protected activity under Title VII, a plaintiff must complain

that "discrimination occurred because of sex, race, national origin, or some other protected

class." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quoting *Tomanovich v.*

*City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). It is not enough to simply complain
"about some situation at work, no matter how valid the complaint might be." *Id.* (quoting *Cole v.
Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)). Rather, "[a] complaint of
discrimination is a protected activity under Title VII only if the discrimination is based on a
protected characteristic like race." *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir.
2021); *see also McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022) ("The charge—
whether formal or informal—must be about the discrimination.").

Here, the Plaintiff does not point to facts or details showing that the Plaintiff's complaint
involved a complaint of discrimination based on a protected characteristic. The only part of the
record that the Plaintiff cites is her letter to McNeal, but she does not identify any specific part of
the letter that shows she reported discrimination based on a protected characteristic. A review of
the letter shows no evidence of a complaint of discrimination and only a report of the Plaintiff's
reasons for her disagreement with both the PIP and the determination that she violated the
Defendant's Corrective Action Policy, her request for an investigation based on this
disagreement, and a report of her belief that other employees violated what appears to be the
Corrective Action Policy. The Plaintiff's complaint is not the type of complaint protected under
§ 1981 or Title VII. *See Skiba*, 884 F.3d at 718–19 (finding the plaintiff's retaliation claim failed
when he never suggested unlawful discriminatory animus); *Tomanovich*, 457 F.3d at 663
("Merely complaining in general terms of discrimination or harassment, without indicating a
connection to a protected class or providing facts sufficient to create that inference, is
insufficient."). Thus, the Plaintiff's complaint to McNeal cannot serve as a basis for her
retaliation claims.

Accordingly, the Plaintiff's retaliation claims fail on the first element. Since the Plaintiff has not shown that she engaged in a statutorily protected activity, the Court need not address the parties' arguments about causation. Therefore, the Defendant is entitled to summary judgment on the Plaintiff's claims for retaliation under § 1981 and Title VII in Counts III and IV.[5]

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendant Franciscan Alliance's Motion for Summary Judgment [ECF No. 23]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the Defendant Franciscan Alliance and against the Plaintiff Demettress Burnett on all Counts of the Complaint. The Plaintiff takes nothing by her Complaint.

SO ORDERED on March 6, 2024.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

[5] To the extent that the Plaintiff asserts that her orientation and training were deficient and her supervisor harassed her, any arguments under a failure-to-train claim or a hostile environment claim are waived because she did not develop such arguments. *See, e.g., Barnes-Staples*, 88 F.4th at 719.